```
              UNITED STATES DISTRICT COURT
                 DISTRICT OF MINNESOTA
                 Civil No. 10-509(DSD/JJK)
```

Michael Imp,

       Plaintiff,

v.                                      **ORDER**

Chris Wallace, individually
and in their official
capacities as Olmsted County
Deputy Sheriffs and Mark
Maitland, individually and
in their official capacities
as Olmsted County Deputy Sheriffs,

       Defendants.

    Duane A. Kennedy, Esq., Kennedy Law Office, 724 First Avenue S.W., Suite 3, Rochester, MN 55902 and William L. French, Esq., French Law Firm, 400 South Broadway Avenue, Suite 201, Rochester, MN 55904, counsel for plaintiff.

    John M. Baker, Esq., Samuel J. Clark, Esq. and Greene Espel, PLLP, 200 South Sixth Street, Suite 1200, Minneapolis, MN 55402, counsel for defendants.

    This matter is before the court upon the motion for summary judgment by defendants Chris Wallace and Mark Maitland, deputy sheriffs in Olmsted County, Minnesota (the Deputies). Based on a review of the file, record and proceedings herein, and for the following reasons, the court grants the motion.

                                 **BACKGROUND**

    This excessive-force case arises out of the arrest of plaintiff Michael Imp on May 30, 2007. Shortly after midnight,

Wallace saw Imp's vehicle drift across the center and side lines of a highway. Baker Aff. Ex. A, at 19:37–21:34.[1] After Wallace pulled the vehicle over, Imp admitted consuming three beers and said that he had previously been convicted of driving while impaired. See id. at 22:08–23:30. Wallace administered a series of field sobriety tests. Id. at 26:07–30:31. During the third test, Imp became agitated, and Wallace said, "Why are you getting so mad at me?" Id. at 30:31–30:33. Imp said, "Because I've been through this before, and I'll pass your test. I haven't drank a fucking — I've had three fucking beers tonight. I'm not going to lie to you. I've had a DUI." Id. at 30:33–30:44. Imp then said, "I'll take the test right now ... dude, I'll take the Breathalizer." Id. at 30:48–30:52. Maitland arrived shortly after. Id. at 31:08.

Wallace attempted to administer a preliminary breath test (PBT). Id. at 31:55–32:20. Imp did not provide an adequate sample. Id. After the second attempt Imp said, "You are just being a dick to me," and asked why he had been pulled over. Id. at 32:28–32:42. Wallace told Imp that he stopped him because Imp had crossed the "fog line" three times and crossed the center line once. Id. at 33:04–33:09. Wallace checked the PBT and said, "Turn around, and put your hands behind your back." Id. at 33:15–33:31.

---

[1] Exhibit A is a MPEG file of the video and audio recording of the incident captured from Wallace's squad vehicle. Citations refer to the time stamp in the recording.

Imp said, "What'd the test say?"  Id. at 33:31–33:33.  Wallace said, "One-five.  You're under arrest for DUI."[2]  Id. at 33:33–33:35.  Wallace twice repeated the command to turn around before Imp complied.  Id. at 33:29–33:40.  Once handcuffed,[3] Imp said, "I wanna see the test.  C'mon, you gotta be kidding me.  One-five?  Can I see it?"  Id. at 33:53–33:58.  Wallace said, "I already shut it off."  Id. at 33:59–34:00.

Wallace then attempted perform a patdown of Imp.  When Wallace reached for Imp's right pocket, Imp flinched and stepped away.  Id. at 33:59–34:01.  The Deputies then quickly moved Imp to the front of Wallace's vehicle.  Id. at 34:01–34:04.  Wallace said, "Quit screwing around, I'm not playing games with you anymore."  Id. at 34:06–34:09.  Maitland told Imp, "We don't know if you have anything in your pockets or not, okay?"  Id. at 34:11–34:13.  While Wallace removed several items from Imp's pockets, Imp repeatedly demanded to see the PBT.  Id. at 34:13–34:45.  The Deputies continued to tell him that the PBT had been cleared and that the results would be in their report.  Id.  Wallace then told Imp to "lean over."  Id. at 34:46.  Imp did not comply, and the Deputies repeated the instruction.  Id. at 34:46–34:50.  Imp resisted, and

---

[2] According to Imp, Wallace did not tell him the results of the PBT until after he had asked him "a bunch of times."  Imp Dep. 27:3-5; 33:2-8.

[3] According to Imp, Wallace did not place him in handcuffs until Imp was "on the hood" of Wallace's vehicle.  Imp Dep. 23:6.

3

Maitland then pushed Imp's chest and head onto the hood of the squad vehicle.[4]  Id. at 34:50–34:54.  Imp continued to resist by arching his back, and Maitland again forced him forward.  Id. at 34:54–35:08.  Imp repeated his demands to see the PBT, and said, "You are so wrong right now.  Why are you doing this to me, dude?"  Id. at 35:15–35:17.  Wallace said, "You are under arrest for DUI."  Id. at 35:19–35:22.

As the Deputies escorted Imp towards the passenger side of Wallace's vehicle, Imp shouted, "You have no fucking right to do this to me.  I wanna see the test."[5]  Id. at 35:36–35:40; see Imp Dep. 31:22–23.  Over the next three minutes, Imp shouted profanities and demanded to see the test at least nineteen times.  Baker Aff. Ex. A, at 35:40–38:36.  The Deputies repeatedly told him to stop resisting, that he was under arrest for driving while impaired and that the result would be in the report.  Id.  Imp braced himself against the back seat, refused to get in the

---

[4] According to Imp, he "never struggled at any point with the two officers."  Imp Dep. 34:21–22.

[5] The Deputies and Imp move out of the field of view of the camera, but the videotape continues to record sound.  The audio track also records the constant, loud barking of what appears to be Wallace's canine partner.  Imp does not recall a dog being present.  See Imp Dep. 35:20–24.

vehicle, and "hooked the bottom part of [his] leg against the bottom of the door [frame]." Imp Dep. at 37:12-17.

The Deputies then took Imp "down into the nearby ditch." Id. at 33:21-22. The Deputies placed their knees on his back and pushed him into the mud in the ditch. Id. at 33:21-24. As a result, Imp was "unable to get up from being thrown down in the ditch, and both officers had to carry [him] back up to the squad car." Id. at 33:25-34:2.

When the Deputies brought Imp back to the vehicle, Imp again braced his body to prevent being placed inside. Id. at 38:14-19. The Deputies told Imp to get in the squad vehicle numerous times. Baker Aff. Ex. A, at 35:40-38:36. According to Imp, "[the Deputies] had told [him] that if [he] didn't slide into the vehicle, that [he] would be tased" and then "Officer Maitland cracked off the end of it and stuck it into my chest while I was laid down." Imp Dep. 39:14-22. Maitland deployed the X-26 Taser in drive-stun mode. Baker Aff. Ex. C, at 15.

After the first taser deployment, the Deputies told Imp to get in the vehicle at least twenty-seven more times and warned him at least thirteen times that they would use the taser again if he did not comply. Baker Aff. Ex. A, at 38:42-41:30. Imp did not comply and continued loudly to demand to see his PBT results. After

5

nearly three minutes, the Deputies used the taser a second time.[6] The taser caused Imp's legs "not [to be] braced against the car anymore." Imp Dep. 47:23-48:1. Imp slid to the ground because "[his] muscles were locked up," and the Deputies placed him into the vehicle. Id. at 48:1-5. Thereafter, Wallace transported Imp to jail, where his blood alcohol test registered 0.13. Id. at 51:19.

Wallace photographed Imp's injuries. Id. at 51:1-4; see Kennedy Aff. Exs. F-1 to -4. Imp did not seek medical attention and returned to work, where he worked lighter duty for a week. Imp Dep. 58:12-14; 59:1-9. He experienced pain in his abdomen for "a good month" after his arrest. Id. at 59:13-16. Imp has scars from some of the taser contacts. Id. at 43:1-5.

On February 23, 2010, Imp began the present action against the Deputies in their individual and official capacities.[7] Imp claims that the Deputies used excessive force and committed battery during his arrest by "smash[ing]" his face into the hood of the squad vehicle "very hard and very violently;" placing him face down on the ground in the ditch with their knees on his back and tasing him

---

[6] According to Imp, "maybe a minute" passed between the first and second uses of the taser, during which time he "probably didn't say too much." Imp Dep. 44:5-9, 45:8-9.

[7] Imp withdrew his official-capacity claims and any other claims against the Olmsted County Sheriff's Department. See Pl.'s Mem. Opp'n 1 ("The Plaintiff withdraws his claims against the Defendants' employers.").

"for thirteen seconds, resulting in 10 dual taser burns, from 500,000 volts of electricity being shot into him."[8]  Pl.'s Mem. Opp'n 2-3.  Defendants move for summary judgment.

## DISCUSSION

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.  See id. at 252.  The nonmoving party must set forth specific facts sufficient to raise a genuine issue for trial; that is, the nonmoving party "must do more than simply show that there is some

---

[8] Imp misunderstands voltage.  First, voltage is a measure of electric potential per unit charge and is only meaningful in the context of current.  While "50,000 volts" may sound frightening, any child whose hair stands on end while touching a low-current Van de Graff generator observes that an electric potential of even hundreds of thousands of volts does not necessarily cause shock or injury. Moreover, voltage is not additive with each taser contact: applying the taser ten times does not mean that Imp had "500,000 volts of electricity being shot into him."  Pl.'s Mem. Opp'n 2-3. Lastly, even if relevant, the record and video support two taser deployments, not ten.

7

metaphysical doubt as to the material facts." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); see Anderson, 477 U.S. at 249-50.

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party, and does not make credibility determinations. See Anderson, 477 U.S. at 255. When the record contains an unchallenged video and audio recording of the events, the court views "the facts in the light depicted by the videotape." Scott v. Harris, 550 U.S. 372, 381 (2007).

**I.  Qualified Immunity**

"The doctrine of qualified immunity protects [law enforcement] officers from personal liability under § 1983 insofar as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known." Baribeau v. City of Minneapolis, 596 F.3d 465, 473 (8th Cir. 2010) (citation and internal quotation marks omitted). The court applies the doctrine of qualified immunity in a manner that "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." Walker v. City of Pine Bluff, 414 F.3d 989, 992 (8th Cir. 2005) (quoting Hunter v. Bryant, 502 U.S. 224, 229 (1991)).

To determine whether the Deputies are entitled to qualified immunity, the court views the facts in the light most favorable to

Imp and considers (1) whether the alleged facts demonstrate that the conduct of the Deputies violated a constitutional right and (2) whether the right claimed was clearly established at the time of the alleged injury. See id. "If the answer to either question is no," then the Deputies are entitled to qualified immunity. Doe v. Flaherty, 623 F.3d 577, 583 (8th Cir. 2010); see Pearson v. Callahan, 129 S. Ct. 808, 818 (2009).

**II.  Excessive Force**

A law-enforcement officer violates the Fourth Amendment right to be free from unreasonable seizure when the officer uses excessive force to apprehend or detain a person. See Graham v. Connor, 490 U.S. 386, 395 (1989); Cook v. City of Bella Villa, 582 F.3d 840, 849 (8th Cir. 2009).  However, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Cook, 582 F.3d at 849 (quoting Graham, 490 U.S. at 396); see Minn. Stat. § 609.06 subdiv. 1(1)(a) (authorizing law-enforcement officers to use reasonable force to effect arrest).  As a result, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Cook, 582 F.3d at 849 (quoting Graham, 490 U.S. at 396).

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S.

at 396 (citing Terry v. Ohio, 392 U.S. 1, 20-22 (1968)). The "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Id. at 396-97; see Brown v. City of Golden Valley, 574 F.3d 491, 496 (8th Cir. 2009).

Thus, the court considers "whether the amount of force used was objectively reasonable under the particular circumstances" in light of the information possessed at the time of the alleged violation. Brown, 547 F.3d at 496 (citations omitted); see Rohrbough v. Hall, 586 F.3d 582, 586 (8th Cir. 2009). When evaluating an officer's use of force, a court considers the totality of the circumstances and pays "careful attention to the facts and circumstances of [the] particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396.

### A. Stabilizing Imp on Vehicle and in Ditch

The Deputies had probable cause to arrest Imp for driving while impaired. The video shows Imp agitated and failing to comply with commands to blow into the PBT and to turn around to be placed in handcuffs. Imp then reacts and resists Wallace's attempt to

perform a search incident to arrest. As a result, stabilizing Imp against the squad vehicle was reasonable. In light of Imp's continued resistance and refusal to lean his torso onto the vehicle, forcing him onto the vehicle was reasonable.

Imp continued his verbal and physical resistance. He refused to get in the squad vehicle and braced himself to prevent being placed inside. Imp Dep. 36:15–37:17. As a result, taking Imp to the ground was objectively reasonable. In short, the Deputies were dealing with an intoxicated, uncooperative and belligerent person whose arrest required application of force. See Wertish v. Krueger, 433 F.3d 1062, 1067 (8th Cir. 2006). Stabilizing Imp against the vehicle and ground was objectively reasonable, and therefore the Deputies are entitled to qualified immunity.

Moreover, in May 2007, it "was not clearly established ... that an officer violated the rights of an arrestee by applying force that caused only de minimis injury." Chambers v. Pennycook, 641 F.3d. 898, 908 (8th Cir. 2011); see id. at 904–05. Given the state of the law at the time, "a reasonable officer could have believed that as long as he did not cause more than de minimis injury to an arrestee, his actions would not run afoul of the Fourth Amendment." Id. In the present case, the record shows only minor scrapes and bruises.[9] Imp did not require or seek medical

---

[9] The court does not address whether the reasoning of Chambers applies to the Deputies' use of the taser. Unlike most uses of
(continued...)

11

attention after his arrest.  Nothing in the record supports a finding that his injuries were anything more than de minimis.  See Wertish, 433 F.3d at 1067 (finding relatively minor scrapes and bruises and less-than-permanent aggravation of prior injuries to be de minimis).  Therefore, the Deputies are entitled to qualified immunity, and summary judgment is warranted.

   **B.   Use of Taser**

The Deputies next argue that their use of the taser in drive-stun mode[10] was objectively reasonable.  As with any use of force, the court must balance the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the

---

[9](...continued)
force, for which degree of injury is a proxy for degree of force, a taser in drive-stun mode causes significant pain but minimal or no injury.

[10] An X-26 Taser used in drive-stun mode directly contacts the subject without deployment of the darts.  See Baker Aff. Ex. C, at 20 (expert report of Joshua Lego); McKenney v. Harrison, 635 F.3d 354, 364 (8th Cir. 2011) (Murphy, J., concurring) (citing Bryan v. MacPherson, 630 F.3d 805, 826 (9th Cir. 2010) (Wardlaw, J., concurring in denial of rehearing en banc).  In dart mode, a taser penetrates the skin and causes neuro-muscular interruption (NMI).  See Baker Aff. Ex. C, at 20; see McKenney, 635 F.3d at 364.  NMI causes the subject to lose control of his muscles, which can lead to injuries from falling while paralyzed.  See McKenney, 635 F.3d at 364; Bryan, 630 F.3d at 824.  In contrast, drive-stun mode causes a painful stimulus but does not lead to NMI.  Baker Aff. Ex. C, at 20; McKenney, 635 F.3d at 364.  As a result, a taser in drive-stun mode is more than trivial force, but it is a less-intrusive — and less risk-laden — use of force than a taser in dart mode.

countervailing government interests at stake." McKenney, 635 F.3d at 359 (citation and internal quotation marks omitted); Cook, 582 F.3d at 849.

In the present case, use of the taser in drive-stun mode allowed the Deputies to effect the arrest without resorting to a greater intrusion upon Imp's Fourth Amendment rights. Imp's belligerent response turned a quick encounter into a lengthy altercation on the side of the highway. Imp positioned his body to prevent being placed in the vehicle. As a result, the force required to strong-arm Imp's body into the squad vehicle against his will would have necessarily risked injury to Imp and the Deputies. Use of the taser in drive-stun mode avoided use of brute physical force to overcome Imp's resistance to entering the squad vehicle. The Deputies are entitled to qualified immunity on this basis alone.

Moreover, countervailing governmental interests outweigh the Fourth Amendment intrusion of the taser. Moving Imp from the front of the vehicle to the back seat would have taken at most a few seconds had Imp complied. He did not. Instead, he created a prolonged encounter by resisting, shouting profanities at the Deputies and repeatedly demanding to see the results of the test. Before the first use of the taser, the Deputies repeatedly commanded Imp to get in the squad vehicle to stop resisting and to stop fighting. After the first use of the taser, the Deputies

commanded Imp to get in the squad vehicle at least twenty-seven times, and warned him that they would use the taser again at least thirteen times. Only after repeated commands and warnings do the Deputies use the taser a second time. Repeated attempts to use lesser force during this lengthy arrest were ineffective, and use of greater force to end the encounter was objectively reasonable.

Further, Imp's actions placed himself and the Deputies at risk. Imp was intoxicated and belligerent and the encounter occurred at night on a two-lane highway. The video shows fifteen cars pass during the time between the initial stop and finally securing Imp in the squad vehicle. In mitigation, Imp was handcuffed, and two deputies were present. However, his free legs posed a risk that he might flee or kick the officers. Indeed, he used his legs to resist being placed in the squad vehicle. Cf. Cook, 582 F.3d at 849 (finding use of taser reasonable in light of presumably intoxicated subjects, number of subjects, sarcastic comments and noncompliance with commands); accord Buckley v. Haddock, 292 F. App'x 791, 794-95 (11th Cir. 2008) (finding use of taser on handcuffed arrestee reasonable given arrestee's refusal to comply with command to move to patrol car, nightime setting, adjacent highway and repeated directions). Balancing the interests of the government against Imp's Fourth Amendment rights, the court determines that the interests of the government outweighed the

intrusion created by use of the taser. As a result, the Deputies' use of the taser was objectively reasonable and they are entitled to qualified immunity. Therefore, summary judgment is warranted.

### III. Battery

Imp also claims that the Deputies committed battery. Having determined that summary judgment is warranted on Imp's federal claim, the court exercises its discretion to retain supplemental jurisdiction over the pendant state claim. Under Minnesota law, battery is "an intentional unpermitted offensive contact with another." Paradise v. City of Minneapolis, 297 N.W.2d 152, 155 (Minn. 1980) (citations omitted). A law-enforcement officer may use reasonable force in effecting a lawful arrest, Minn. Stat. 609.06 subdiv. 1(1)(a), but "may not subject the person arrested to any more restraint than is necessary for the arrest and detention," id. § 629.32. Thus, to prevail on a claim of battery, Imp must show that the Deputies used unreasonable force during the arrest. See Paradise, 297 N.W.2d at 155. The court has already determined that the Deputies' use of force was objectively reasonable, and therefore summary judgment is also warranted on the battery claim.

**CONCLUSION**

Accordingly, based on the above, **IT IS HEREBY ORDERED** that the motion for summary judgment [Doc. No. 10] is granted.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  September 21, 2011

s/David S. Doty
David S. Doty, Judge
United States District Court
